# In the United States Court of Federal Claims

No. 22-152C
(Filed Under Seal:  July 27, 2022)
(Reissued for Publication:  August 12, 2022)<sup>*</sup>

*****************************************

| | |
|---|---|
| TRILLION ERP VENTURE TECH LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| APPDDICTION STUDIO LLC, | * |
| | * |
| Defendant-Intervenor. | * |

Postaward Bid Protest; Cross-Motions for
Judgment on the Administrative Record;
Evaluation of Proposals; Best-Value
Tradeoff; Motion to Supplement the
Administrative Record

*****************************************

<u>William A. Shook</u>, Washington, DC, for plaintiff.

<u>Kristin E. Olson</u>, United States Department of Justice, Washington, DC, for defendant.

<u>Jeffery M. Chiow</u>, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

      In this postaward bid protest, plaintiff Trillion ERP Venture Tech LLC ("TERP") contends that the Federal Emergency Management Agency ("FEMA") improperly awarded a blanket purchase agreement ("BPA") for technical assistance for application development, sustainment, and integration services to defendant-intervenor Appddiction Studio LLC ("Appddiction").  TERP seeks declaratory and injunctive relief.  Before the court are TERP's motion for judgment on the administrative record, defendant's and Appddiction's cross-motions for judgment on the administrative record, TERP's motion to supplement the administrative record, and defendant's motion to strike.  As explained below, because supplementation of the administrative record is neither necessary nor appropriate, the court denies TERP's

---

      <sup>*</sup> This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on August 10, 2022.  The redactions are indicated with bracketed ellipses ("[. . .]").

supplementation motion, and denies defendant's motion to strike as moot.  Further, because TERP has not established that FEMA's decision to award the BPA to Appddiction was improper, the court denies TERP's dispositive motion and grants defendant's and Appddiction's cross-motions for judgment on the administrative record.

## I.  BACKGROUND

### A.  History of the Procurement

#### 1.  Request for Quote

On June 18, 2021, FEMA's Recovery Technology Programs Division ("RTPD") issued solicitation number 70FA3021Q00000042, a Request for Quote ("RFQ") to provide technical assistance and system sustainment support for FEMA's disaster recovery technology programs. Admin. R. ("AR") 231-494.[1]  It sought to award a BPA with a twelve-month base period and four subsequent twelve-month option periods.  Id. at 433.  Orders under the BPA, often referred to as call orders, could be firm-fixed-price orders, time-and-material orders, or labor-hour orders. Id. at 435.

According to the RFQ's Statement of Work, the RTPD is responsible for a host of information technology systems that support recovery efforts for both public and individual assistance, including the Automated Construction Estimating Software System ("ACE") and the National Emergency Management Information System – Individual Assistance ("NEMIS-IA"). Id. at 294.  FEMA anticipated that the first task order under the BPA would be for services supporting the NEMIS-IA disaster recovery program, id. at 1006, and thus included in the RFQ the potential order's Statement of Work and Price Template, id. at 302-42.

FEMA issued the RFQ under the federal supply schedule procedures of Federal Acquisition Regulation ("FAR") subpart 8.4.  Id. at 488.  In contrast to FAR part 15, which contains the rules governing competitive and sole-source negotiated acquisitions, FAR part 8 "provides Federal agencies . . . with a simplified process for obtaining commercial supplies and commercial services . . . ."  FAR 8.402.

#### 2.  Evaluation Scheme

FEMA chose a best-value evaluation model where "the Government is more concerned with obtaining a technically superior evaluation than with obtaining the lowest priced solution." AR 488.  However, FEMA explained that, "[a]s the ratings of the technical evaluation factors

---

[1]  The administrative record includes three versions of the RFQ.  Although they are not designated as such on their faces, defendant labels them in the index to the administrative record as the original RFQ and two amendments to the RFQ.  In this decision, the court cites to the latest version of the RFQ, which includes the apparent second amended version of the RFQ, AR 429-94, and the attachments to the original RFQ, id. at 293-301 (RTPD Statement of Work), 302-38 (call order Statement of Work), 360 (Prior Experience Questions).

and/or the merits of the technical quotes become <u>closer</u> or <u>even</u>, price will become more important in the award decision." <u>Id.</u>

The RFQ set forth three evaluation factors.  <u>Id.</u> at 488-89.  Factors 1 and 3 were based on the quoters' written presentations, while Factor 2 was based on the quoters' oral presentations:[2]

> Phase I:
> Factor 1 – Demonstrated Prior Experience
>
> Phase II:
> Factor 2 – Management, Staffing/Hiring, and Technical Approach
> Factor 3 – Price

<u>Id.</u>  FEMA explained that to determine the best-value quote, "Factors 1 and 2 [would] be evaluated with a rating scale of 'high confidence[,]'[] 'moderate confidence,' and 'low confidence,' representing the Government's confidence that the Quoter understands the requirement and will successfully perform the work."  <u>Id.</u> at 489.

For Factor 1, FEMA asked a series of questions concerning the quoters' prior experience and would evaluate the quoters based on their answers.  <u>Id.</u>  These questions sought examples involving information technology system modernization, software development, and the quoters' abilities to conform to federal standards.  <u>See e.g.</u>, <u>id.</u> at 360 (organizing the questions into several categories); 480-81 (referencing the questions).

For Factor 2, FEMA would rely on the quoters' "oral presentation[s] and responses to questions asked by the government" to determine whether the quoters could "successfully manage and staff the BPA and the NEMIS-IA call order, perform the required tasks, and provide the deliverables as set forth in the RFQ and attached work statements."  <u>Id.</u> at 489.  Specifically, FEMA explained it would evaluate:  (1) "the Quoter's approach to accomplishing the required work and flexibly scaling & managing staff and computing resources to satisfy evolving and surging demands to meet program and operational needs," (2) "the Quoter's approach to ensure the labor categories and skill mix . . . are adequate to successfully perform the tasks/subtasks outlined in the attached work statements," and (3) "the interactions between participants to assess communication and team cohesion as well as each participants' overall knowledge and comfort with the information presented."  <u>Id.</u> at 489-90.

For Factor 3, FEMA planned to evaluate the quoters' "total evaluated price," which would be "derived from the proposed price of the base period plus option periods for the NEMIS-IA call order."  <u>Id.</u> at 490.  FEMA explained that "[t]he 'total evaluated price' [would] be evaluated for price reasonableness through comparison with other proposed prices and [the evaluation might] include other price analysis techniques."  <u>Id.</u>

---

[2]  Throughout the solicitation, titled "Request for Quote," FEMA referred to vendors who submitted bids as both "quoters" and "contractors."  The court will use the "quoters" naming convention to reference those vendors who submitted quotes in response to the RFQ.

To evaluate Factors 1 and 2, FEMA established a Technical Evaluation Team ("TET"). Id. at 1007.  The Contracting Officer ("CO") would analyze the proposed price.  Id. at 984, 1005.

### 3.  Evaluation of Proposals and Source Selection Decision

Nine vendors submitted quotes in response to the RFQ.  Id. at 495-949.  The evaluation was conducted in two phases; based on their ratings in the first phase, four quoters—including TERP and Appddiction—participated in the second phase.[3]  Id. at 984.

Evaluating quotes under Factor 1—demonstrated prior experience—the TET assigned a confidence rating to each quote and listed, in bullet-point format, reasons that aspects of the quote "increase[d] confidence" or "decrease[d] confidence" in that quoter.[4]  See id. at 950-70. FEMA assigned "high confidence" to TERP, Appddiction, and two other quoters.  Id. at 951. The bullet points the TET listed for TERP and Appddiction are as follows:[5]

| TERP | Appddiction |
|---|---|
| Increases confidence:<br>• Vendor manages 300 personnel across 16 agile teams (Eagle II)<br>• Familiarity with replacing monolithic applications with microservice based cloud native apps, mobile applications, design thinking and human center design<br>• Fast lead time for onboarding new staff due to incumbent capture of staff - day 1 value.<br>• Familiarity with the current FEMA/RTPD work and NEMIS IA<br>• Ability to develop native apps that are cross-platform with threat detection and conditional access to enterprise apps. | Increases confidence:<br>• Vendor has experience blending their own resources into integrated agile product teams that mix federal and contractor personnel<br>• Vendor has experience with containerization of legacy systems and leveraging microservice architecture<br>• Vendor has experience with similar system volume and complexity as anticipated for this BPA.<br>• Vendor has experience collaborating with multiple system owners and product owners.<br>• Vendor's experience includes reserving capacity to address both sustainment and modernization as |

---

[3] TERP, Appddiction, and another quoter received high ratings for the first phase and were advised to proceed to the second phase.  The fourth quoter only received a moderate rating; therefore, based on the RFQ, FEMA "advised [that quoter] not to proceed to Phase II" as that quoter was "unlikely to be [a] viable competitor[]."  AR 481.  However, FEMA's recommendation was only "advisory," see id., and the fourth quoter decided to participate in the second phase of the evaluation.

[4] For ease of reference, particularly in the Discussion section below, the court refers to these as "confidence bullets" and "lack-of-confidence bullets."

[5] The bullet points are presented without alteration.

- Vendor has high level of experience with addressing cybersecurity needs for other federal agencies as well as FEMA.  Knowledge and ability to assist and be compliant with the ATO process
- Vendor demonstrated more than sufficient experience in privacy-related concerns specifically with handling of PII, PTA, and overall DHS Privacy Manual
- Vendor demonstrated a thorough knowledge of FEMA environments and constraints in both security and coding standards
- Experience with surge staffing and provides a program management office (PMO) to manage call orders without interrupting in-flight work
- Extensive experience with mobile application, use of Intune, Azure cloud, and developing cross-platform applications
- Responded quickly to legislative changes, daily changes can be made within hours, have had updates in place within 24 hours from change
- Vendor demonstrated extensive experience with managing BPA work for multiple federal agencies which is similar in scope and complexity to this BPA.
- Vendor has experience supporting systems with similar transaction volume and number of users
- Vendor's description of experience supporting both legacy system sustainment and modernization highlights their flexibility to adjust teams appropriately to do the work as well as leveraging scaled agile framework
- Vendor's description of managing sustainment and modernization for PIVOT shows maturity and risk management because they ran the legacy and modernized systems in

well as coordinating multiple agile delivery teams.  Reserve [. . .] capacity for sustainment and remaining for feature development and modernization.
- Vendor's experience with refactoring, optimizing, and securing oracle databases and migrating environments to DOD cloud are similar in nature to what this BPA will require.
- Vendor's approach to recruiting, hiring, and managing teams with minimal impact to in-flight work was thorough and mature.
- Vendor has experience tailoring agile and using scaled agile framework, including leveraging shared services teams. This is similar to how RTPD envisions work being done on this BPA.
- Vendor's explanation of experience working through major system modernization challenges and ensuring system compliance while also engaging with stakeholders is mature and thorough.  Stakeholder engagement and collaboration; at end of 2-week sprint with demo, collaboration, and capture feedback
- Vendor demonstrated robust mobile application support and development knowledge and experience
- Vendor demonstrated experience with commonly used SDLC tools and tailoring tool usage to customer needs
- Extensive experience with FEMA/Government security protocols, FISMA scorecard, POA&M/ATO processes
- The vendor has managed 37 task orders with 458 FTE's & 350 systems under one IDIQ

| | |
|---|---|
| parallel for 9 months while establishing the new system of record<br>• Vendor's description of hiring and managing team structure was thorough and flexible<br>• Vendor's experience with communicating changes with internal and external stakeholders was thorough, covering multiple levels of engagements with users, product owners, and other key stakeholders | • Familiarity with DHS/FEMA/RTPD systems and the tools we use<br>• Vendor demonstrated more than sufficient knowledge of modernizing applications and monolithic systems to cloud-based environments<br><br>Decreases confidence:<br>• Did not adequately address experience with Privacy compliance |

Id. at 964-65 (listing confidence bullets and one lack-of-confidence bullet for Appddiction), 968-69 (listing confidence bullets for TERP).

Similar to Factor 1, the TET assigned confidence ratings to quoters for Factor 2—management, staffing/hiring, and technical approach—and listed its reasoning for those ratings in the form of confidence and lack-of-confidence bullets.  See id. at 971-81.  Again, both Appddiction and TERP received "high confidence" ratings.  The bullet points the TET listed for TERP and Appddiction are as follows:[6]

| TERP | Appddiction |
|---|---|
| Increases confidence:<br>• Delineated several Key Personnel with multiple commitments<br>• Approach includes [. . .] incumbent capture, including many incumbent staff under their active contracts<br>• Recognized that the cloud is not a solution for every legacy system modernization effort, TERP plans to support legacy systems where a cloud solution may not be best for FEMA<br>• Strong teaming agreement and partnership provides a wide breadth of expertise and available support for the BPA<br>• Overall thorough and well-articulated responses to FEMA's questions | Increases confidence:<br>• Knowledgeable and willing to partner through organizational transformations<br>• The vendor's continuous recruiting approach and demonstration of 7-day turnaround on certain key roles<br>• Their communication plan would keep FEMA stakeholders informed throughout the work effort<br>• Walked us through their approach to code commit in DevSecOps with deployment in smaller chunks in order to more finely compartmentalize releases to minimize security exposure<br>• Combination of external training, partnerships with Universities and other strategic stakeholders, continuous recruitment of top |

---

[6]  The bullet points are presented without alteration.

- Approach to staff and managing the BPA Call Order is robust and includes considerations for leveraging shared resources and dedicated resources to support multiple work streams
- Detailed explanation of how Scaled agile framework would be applied to the BPA
- Demonstrated a detailed and thorough security protocols approach
- On-the-Spot response to a possible PII data breach was detailed and showed their expertise and familiarity with FEMA's policies
- Demonstrated clear understanding of the challenges and considerations to enable data exchanges and the mechanisms to do it. Their response included considerations for security compliance and ICDs
- Mobile applications approach showed an understanding how to make them device and app specific and the challenges behind both. Also showed the need to provide accessibility for web-based and mobile browsers

Decreases confidence:
- The proposed 25 Key Personnel would provide an administrative burden for FEMA

---

- talent and internal training and evaluation provides ready access to strong bench of qualified staff to support needs
- The detailed briefing demonstrated strong cohesion between Appddiction, [. . .] and the [. . .] team. They delivered a balanced presentation between the management and technical approaches throughout Factor 2 among the presenters.
- [. . .]
- Detailed presentation on Cybersecurity Compliance and answers to On the Spot Questions indicate a depth of knowledge of applicable security and compliance protocols as well as the vendor's approach to security breaches and the mentioning of playbook processes
- Understood FEMA will evolve and that they will adapt their approach, including the use of additional resources and job categories as capabilities change and to prepare for modernization
- Identified a difference in approach to emergent needs versus intentional development attempting to minimize the impact of emergency needs
- Offers a shared services team, dev team, O&M team, and data team to split resources with key personnel to support multiple work streams
- Detailed process by which they would integrate microservices, cloud technologies and mobile applications for this BPA while still supporting legacy systems
- Uses a library of tools to capture user feedback as part of their human-centered design approach
- In their system performance scenario response they did not

| | |
|---|---|
| | immediately assume the system was on the cloud.  They walked us through the multiple steps and avenues which included responsible restoration of service and adding it to the backlog for future development. |
| | • Emphasized the need and use of quarterly status meetings and their importance in managing the RTPD portfolio |
| | • Their approach for completing all tasks regardless of criticality |
| | • They understood that automated testing is not always feasible and that manual testing would be needed for some systems |

Id. at 977-78 (listing confidence bullets for Appddiction), at 980-81 (listing confidence bullets and one lack-of-confidence bullet for TERP).

For Factor 3—price—the CO performed a price analysis and "determined that all Quoters submitted fair and reasonable pricing based on the adequate price competition that had been established through receipt of four (4) price quotes." Id. at 1005.  As a result, the confidence ratings and proposed prices of quoters who participated in the second phase of the evaluation were documented as follows:

| Quoter | Factor 1 | Factor 2 | Factor 3 |
|---|---|---|---|
| Quoter A | Moderate | Moderate | $[. . .] |
| Quoter B | High | Low | $[. . .] |
| TERP | High | High | $27,131,005.32 |
| Appddiction | High | High | $22,941,805.65 |

Id. at 1007.

As explained above, FEMA was "more concerned with obtaining a technically superior solution than with obtaining the lowest priced solution." Id. at 1006.  Based on Factors 1 and 2, Appddiction and TERP were the two quoters the CO, in his role as Source Selection Authority, considered for award, as they received high confidence ratings for both nonprice factors. Id. at 1007.  Because Appddiction and TERP received the same high ratings for Factors 1 and 2, the CO determined that they were "technically equal for the non-price factors." Id. at 1008.  Thus, "price [became] the determining factor." Id.  Because Appddiction's proposed total evaluated price was $4,189,199.67 lower than TERP's, the CO concluded that Appddiction's quote offered "the best overall value to the Government." Id.

#### 4. Government Accountability Office Protest

Following FEMA's award to Appddiction, TERP and another quoter filed protests at the Government Accountability Office ("GAO"). Id. at 2498. The protestors raised similar challenges at the GAO that TERP does in this present action. Id. at 2501. First, they raised an organizational-conflict-of-interest ("OCI") challenge arising from the work of an Appddiction subcontractor. Id. Second, they argued that FEMA misevaluated quotes, treated quotes unequally, and conducted an improper best-value determination. Id. Finally, they claimed that Appddiction's quote failed to comply with the applicable limitations on subcontracting pursuant to the FAR. Id. at 2501, 2512-13. Ultimately, the GAO denied the protests, concluding that it had no reason to question FEMA's evaluation and source selection decision. Id. at 2501.

#### 5. OCI Investigation

Approximately one month after TERP filed its protest at the GAO, FEMA conducted an OCI investigation of Appddiction. Id. at 1080-87. In the investigation, FEMA responded to the allegations that were then before the GAO that an Appddiction subcontractor created an "impaired objectivity OCI" because of that subcontractor's other work with FEMA. Id. at 1080-82. Ultimately, FEMA concluded that no conflict existed. Id. at 1082.

### B. This Bid Protest

On February 14, 2022, TERP filed the instant bid protest, challenging FEMA's award to Appddiction. TERP alleges that: (1) FEMA's evaluation of Appddiction and TERP under Factor 2 "was inconsistent with the Solicitation's stated requirements, was performed in a disparate manner, was unreasonable, arbitrary, and capricious, was without observance of procedure required by law, and/or was an abuse of discretion by FEMA"; (2) FEMA failed to perform certain required technical evaluation analyses to determine whether "the proposed labor categories and skill mix were sufficient for performing the work"; and (3) FEMA's source selection decision does not support a finding that an independent tradeoff decision was made by the CO and was, therefore, unreasonable, arbitrary and capricious, or an abuse of discretion.[7]

---

[7] TERP also alleged that Appddiction's proposal relied on a subcontractor arrangement that created an OCI and that FEMA violated FAR requirements governing subcontracting. Compl. ¶¶ 104-12. TERP then briefed these two claims in its motion for judgment on the administrative record. Pl.'s Mot. J. Admin. R. ("Pl.'s MJAR") 30-32. However, in its reply and response to defendant's and Appddiction's cross-motions for judgment on the administrative record, TERP withdrew its arguments regarding these claims. See Pl.'s Resp. to Def.'s & Def.-Int.'s Mot. J. Admin. R. & Reply to Pl.'s Mot. J. Admin. R. ("Pl.'s MJAR Reply & Resp.") 2 n.1 ("Plaintiff hereby respectfully withdraws its arguments regarding the failure of the Government to consider the asserted violation of the Limitations on Subcontracting requirement contained in the Request for Quotes (Argument D) and the failure of the Government to recognize the asserted Organizational Conflict of Interest of one of the awardee's major subcontractors (Argument E)."). Consequently, these issues are no longer before the court.

Compl. ¶¶ 96-103, 113-16.  Plaintiff seeks declaratory and injunctive relief.  Id. ¶¶ 117-18, Prayer for Relief.

During the briefing of the cross-motions for judgment on the administrative record, TERP filed a motion to supplement the administrative record with several documents.  Pl.'s Mot. Suppl. Admin. R. ("Pl.'s Mot. Suppl.") 2.

Briefing of all motions, which was done in accordance with a schedule proposed by the parties, concluded on June 17, 2022.  The parties originally requested that the court hear argument on July 15, 2022, but the court rescheduled the argument for July 27, 2022, due to illness of one of the counsel.

## II.  DISCUSSION

### A.  Plaintiff's Motion to Supplement the Administrative Record

Before addressing the merits of TERP's claims, the court must resolve TERP's motion to supplement the administrative record.  In this protest, the court must review whether FEMA's award to Appddiction was reasonable and in accordance with the evaluation scheme set forth in the solicitation.  See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003) (stating that the court "determin[es] whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements"), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).  Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973).

An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review.  See id. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").  The administrative record "should be supplemented only if the existing record is insufficient to permit meaningful judicial review consistent with" the applicable standard.  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009); accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the 'omission of extra-record evidence precludes effective judicial review.'" (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005))).

In its motion, TERP requests that three documents be added to the administrative record.  First, TERP offers the Declaration of [. . .] and its two attached exhibits.  Pl.'s Mot. Suppl. 2.  Mr. [. . .] was a member of the team that prepared TERP's quote.  Id. at Ex. 1.  In his declaration—which was executed on May 24, 2022—Mr. [. . .] describes some of the processes by which TERP prepared and presented its quote to FEMA.  Id.  The attached Exhibits A and B are copies of scripts that TERP presenters "closely followed" during TERP's oral presentation

for Factor 2.  Id.  Exhibit A is the script TERP prepared for the management, staffing/hiring aspect of its presentation, and Exhibit B is the script TERP prepared for the "technical approach" aspect of its presentation.  Id.  Second, TERP offers "a cover e-mail and letter in which FEMA notifies TERP that it intends to transition work that TERP had been performing to Appddiction." Pl.'s Mot. Suppl. 2.  Finally, TERP offers "a U.S. Government Federal Procurement Data System report of an award to Appddiction for 'ACE System Sustainment.'"  Id.

### 1.  Oral Presentation Scripts and Accompanying Declaration

TERP argues that the documents proffered to supplement the record "are necessary for the Court 'to fully understand the issues' and for 'meaningful judicial review' . . . ."  Id. (quoting Emerald Coast Finest Produce Co. v. United States, 76 Fed. Cl. 445 (2007), and then Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001)[8]).  This court disagrees.  The court turns first to the proposed administrative record supplement consisting of the declaration and attached exhibits containing two scripts for TERP's oral presentation.  TERP argues that supplementation is necessary because "these scripts are . . . the best evidence of the information . . . TERP presented to FEMA during the oral presentation."  Id. at 3.

There are four principal reasons why supplementation in this instance is inappropriate. First, there is no provision in the RFQ for the evaluation of scripts that a quoter prepared in advance of their oral presentation for Factor 2.  If TERP believed the RFQ should have included a provision to allow the submission of scripts that would be used in oral presentations, it should have challenged the terms of the RFQ in a preaward protest.  The Federal Circuit has made clear that "where there is a 'deficiency or problem in the solicitation . . . the proper procedure for the offeror to follow is not to wait and see whether if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'"  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1314 (Fed. Cir. 2007) (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002)) (alteration in original). TERP's failure to challenge that provision of the RFQ results in its acquiescence to the RFQ's terms, where the evaluation for Factor 2 was a rating of oral presentations, not of the scripts prepared for those presentations.

Second, the scripts developed by quoters were not before the FEMA and were not considered when FEMA made its award decision.  During the second phase of the evaluation, all four quoters made oral presentations to the TET and were not permitted to present scripts. Instead, only slides were used during the oral presentations, so including these scripts would add evaluation materials to the administrative record beyond what the RFQ required.  In fact, the RFQ advised quoters that "oral presentation participants not read aloud or heavily rely on pre-written versions of the Quoter's oral presentation," AR 483, and FEMA assigned greater weight to the oral presentation than to the contents of the slides, id. at 490.  Consequently, because quoters did not submit their scripts for the evaluations, FEMA did not consider any of these documents during its decision-making process.

---

[8] Although the decisions upon which TERP relies predate Axiom, the controlling precedent, the propositions quoted by TERP are consistent with Axiom's holding.

Although TERP asks the court to analyze scripts that FEMA did not possess during its evaluation and determine whether TERP's oral presentation should have increased FEMA's confidence in TERP, Pl.'s Mot. Suppl. 3, this is inappropriate under the standard of review required here. If the court were to consider these materials, it would "convert the arbitrary and capricious standard into effectively de novo review." AugustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (quoting Axiom, 564 F.3d at 1380). Under the arbitrary or capricious standard, this court focuses on the reasonableness of the agency's action in light of the materials before the agency and does not conduct an independent evaluation of proposals. Neither the declaration, executed on May 24, 2022, approximately eight months after FEMA made the award to Appddiction, see AR 1069, nor the scripts were before FEMA at the time of award, and these documents shed no light on the reasonableness of the award to Appddiction.

Third, and perhaps most importantly, these documents are not necessary for meaningful judicial review. TERP offers the documents in support of its substantive argument that FEMA's evaluation of the technical proposals was performed in an unequal manner. Pl.'s Mot. Suppl. 3. Yet TERP seeks to include only its scripts and not the scripts used by Appddiction during its oral presentation. To proceed as TERP suggests would create a new administrative record that skews in favor of TERP because only its scripts would be reviewed by the court. Meaningful judicial review is achieved by comparing the proposals submitted by the quoters and the evaluation materials produced by the agency, not by crafting an artificially unbalanced set of materials.[9]

Fourth, as a practical matter, TERP received the highest ratings available for both nonprice factors. Adding these documents to the administrative record could not have any effect on TERP's ratings for those factors. Thus, supplementation of the record with the declaration and the oral presentation script would not only violate the principles of record review, but it would have no impact on the court's ultimate determination regarding the reasonableness of the evaluation ratings assigned by FEMA and the award to Appddiction.

In its reply in support of its motion, TERP further argues that these scripts are required to fill "gaps in the administrative record."[10] Pl.'s Reply Mem. Law in Supp. Pl.'s Mot. Suppl.

---

[9] As Appddiction argues, supplementing the administrative record with TERP's scripts from its oral presentation would amount to a "one-sided story" as the court would not also have Appddiction's scripts from its oral presentation. See Def.-Int.'s Opp'n to Pl.'s Mot. Suppl. Admin. R. 3. The court notes the disjunction in TERP's arguments: on one hand, asking the court to determine whether FEMA evaluated the proposals in an unequal manner; and, on the other, arguing that the record should contain an unequal amount of material favoring TERP's quote.

[10] In its motion, TERP argues that the scripts are "necessary for the Court to evaluate Plaintiff's contention that FEMA treated TERP and Appddiction unequally, and that FEMA failed to sufficiently document its technical evaluation." Pl.'s Mot. Suppl. 3. In its reply, TERP returns to this argument, but also adds a new "gap in the administrative record" argument. Presenting a new argument in a reply is disfavored in this court. See Novosteel SA v. United States, Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the

Admin. R. ("Pl.'s Mot. Suppl. Reply") 4-5.  Without the scripts, TERP argues, the current administrative record "contains no basis for the Court to review the adequacy of the agency decision" and ascertain whether there was unequal treatment in FEMA's evaluation.[11]  Id. However, a review of the administrative record reflects that it is sufficient for this court to review FEMA's evaluation under the proper standard and determine whether its evaluation amounted to disparate treatment.  Accord Terry v. United States, 96 Fed. Cl. 156, 164 (2010) ("[T]he court may only supplement the administrative record after first examining the agency-assembled record and then determining that its ability to adequately review agency action is constrained absent the consideration of extra-record evidence." (citing Axiom, 564 F.3d at 1380)).  Moreover, as explained in more detail below, see infra Section II.B.1, despite

---

first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").  However, the court will address this argument for the sake of thoroughness.

[11]  As discussed below, no gap in the record exists; however, the court will briefly address the decisions TERP relies on in support this argument.  The decisions are all distinguishable, as is made apparent by the parentheticals TERP includes with its citations.  The first decision is Vanguard Recovery Assistance, Joint Venture v. United States, 99 Fed. Cl. 81, 100 (2011), about which TERP parenthetically states that the court found "a gap regarding competing bidders' past performance when legally required past-performance questionnaires were not completed by the agency and thus were not part of the record."  Pl.'s Mot. Suppl. Reply 4.  But TERP does not allege that FEMA failed to complete an entire portion of the evaluation like the procuring agency did in Vanguard, which is what created a gap in the record there.  Second, TERP offers Pitney Bowes Government Solutions, Inc. v. United States, 93 Fed. Cl. 327, 334-36 (2010), stating in its parenthetical that the court allowed "supplementation to reconstruct information contained in bid-proposal evaluations destroyed by the procuring agency's contracting officer."  Pl.'s Mot. Suppl. Reply 4-5.  Unlike in Pitney, TERP does not allege that FEMA destroyed any information, creating a gap in the record.  Third, TERP offers J.C.N. Construction Co. v. United States, 60 Fed. Cl. 400, 404 n.8 (2004), aff'd, 122 F. App'x 514 (2005), stating in its parenthetical that the court determined "that disparate evaluations of past-performance data were not explained in the record before the court."  Pl.'s Mot. Suppl. Reply 5.  In J.C.N., the procuring agency analyzed past-performance data for some offerors but not others, and the parties jointly moved to supplement the administrative record to include "the absent governmentally generated past-performance data."  60 Fed. Cl. at 404 n.8.  Unlike in J.C.N., TERP does not argue that a gap exists because FEMA evaluated Appddiction's oral presentation script and not TERP's.  Instead, TERP acknowledges that FEMA did not have any quoters' scripts for its evaluation.  Finally, TERP offers Asia Pacific Airlines v. United States, 68 Fed. Cl. 8, 18-19 (2005), stating in its parenthetical the court's finding that the "agency's decision making was so informal that the agency's rationale 'was not apparent from the administrative record'" and further provides Midwest Tube Fabricators v. United States, 104 Fed. Cl. 568, 573-74 (2012), as an illustrative example of this type of holding.  Pl.'s Mot. Suppl. Reply 5 (quoting Asia Pac. Airlines, 68 Fed. Cl. at 19).  The administrative record in Midwest Tube was just 86 pages.  104 Fed. Cl. at 573.  Here, the record—consisting of over 2500 pages— is complete and therefore sufficient for meaningful judicial review.

construing the contents of TERP's oral presentation in TERP's favor, the court concludes that FEMA's evaluation did not amount to unequal treatment. Thus, the inclusion of the scripts in the administrative record would not affect the court's analysis.

## 2.   E-mail Correspondence and Report

With respect to the remaining documents, TERP argues that they should be added to the administrative record to show that "Appddiction will be given additional money to perform tasks that have been assigned to the NEMIS-IA Call Order by the RFQ." Pl.'s Mot. Suppl. 3. Again, this court disagrees. The e-mail correspondence and Federal Procurement Data System report could not have been before the agency during its evaluation because both documents were created after FEMA awarded the BPA to Appddiction on September 21, 2021. AR 1069. FEMA sent the e-mail message on May 16, 2022, and attached a letter dated May 10, 2022— approximately eight months after award. Pl.'s Mot. Suppl. Ex. 2. And, according to the report, FEMA issued the referenced solicitation on April 13, 2022—approximately seven months after award. Id. at Ex. 3. Additionally, neither the e-mail correspondence nor the report relate to the contract at issue in the instant bid protest. Therefore, this court need not, and should not, supplement the administrative record with these documents. See Res-Care, Inc. v. United States, 735 F.3d 1384, 1391 (Fed. Cir. 2013) (noting that declarations and a report, offered to supplement the administrative record, had "no bearing" on the central question of the bid protest and were thus properly excluded from the administrative record); Precision Standard, Inc. v. United States, 69 Fed. Cl. 738, 745-46 (2006) (declining to consider e-mail correspondence that occurred after the contract award and, thus, could not have been considered by the CO in making the award decision). Considering the irrelevant nature of these documents, their absence does not preclude the court from engaging in "meaningful judicial review." Axiom, 564 F.3d at 1380.

In conclusion, the court denies TERP's motion to supplement the administrative record. Defendant requests that the court "strike the statements contained in TERP's MJAR response and reply that refer and/or cite to the extra-record materials." Def.'s Opp'n to Pl.'s Mot. Suppl. Admin. R. & Mot. Strike 8. The relief requested by defendant is unnecessary as the court will disregard all references to, and arguments based on, these exhibits. Accord Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 179 (2016) (disregarding references to certain documents in the plaintiff's brief that the court rejected in a motion to supplement the administrative record).

## B.   Cross-Motions for Judgment on the Administrative Record

The court now reviews the merits of TERP's protest.[12] It reviews challenged agency actions pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C.

---

[12] Neither defendant nor Appddiction challenges TERP's standing to bring this suit, and the record of this procurement shows that TERP submitted a bid for the BPA, was evaluated by the TET and the CO, and possessed a substantial chance of award. Thus, TERP has standing to bring this protest. See, e.g., Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (stating that to establish standing the bid protestor must show that it was an actual bidder and that it had a substantial chance of winning the contract).

§ 706(2)(A):  A reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa, 238 F.3d at 1332-33); accord Advanced Data Concepts, Inc., 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

However, procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, Inc., 216 F.3d at 1058.  Furthermore, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

When a protestor challenges a procuring agency's evaluation of a technical proposal, the court's "review . . . should be limited to determining whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements."  Banknote Corp. of Am., 56 Fed. Cl. at 381; accord E.W. Bliss Co., 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.").  However, "[i]f an agency's [technical] evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis."  Lab'y Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 650 (2014) (citation omitted).

"[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations."  Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (alteration in original) (quoting Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992)).  Thus, in addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged

error." Banknote Corp. of Am., 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

## 1. FEMA's Evaluation of the Quotes Was Not Unequal

TERP first argues that "FEMA's evaluation of the technical proposals was performed in an unequal manner." Pl.'s MJAR 24. Based on alleged errors in the technical evaluation, TERP contends that FEMA's unequal treatment of TERP resulted in an evaluation that lacked a rational basis and, therefore, FEMA's evaluation and award were "contrary to the regulations, procurement law, and terms of the RFQ." Id. at 26. Specifically, TERP challenges nine bullet points that FEMA listed in Appddiction's technical evaluation as elements of Appddiction's quote that "increase[] confidence" in Appddiction.[13] Id. at 13-20.

It is well established that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am., 56 Fed. Cl. at 383 (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000)); see also L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 653 (2008) ("Waiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision."); PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."), aff'd, 389 F.3d 1219 (Fed. Cir. 2004). To prevail on a disparate or unequal treatment claim, a protestor must show that its proposal was "'substantively indistinguishable' or nearly identical" to a competitor's proposal but was evaluated differently. Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 516 (2007)). However, "[w]hen a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for the purposes of the evaluation, then the exercise crosses the line and involves the second guessing of 'minutiae' which [courts] are not allowed to undertake." Enhanced Veterans Solutions, Inc. v. United States, 131 Fed. Cl. 565, 588 (2017) (quoting E.W. Bliss Co., 77 F.3d at 449).

As an initial matter, TERP's focus on whether each bullet point that FEMA assigned to Appddiction's quote can be tied directly back to Appddiction's slide presentation is misplaced. TERP points to nine confidence bullets that increased FEMA's confidence in Appddiction and compares those bullets with (1) Appddiction's presentation slides to show that FEMA should not have awarded those bullets to Appddiction and, in some cases, (2) TERP's presentation slides to show that TERP should have earned those bullets. However, this analysis does not consider a

---

[13] TERP challenges nine of Appddiction's confidence bullets; however, in its motion, TERP addresses two of these confidence bullets twice with the same or similar analysis in each instance. Compare Pl.'s MJAR 18 (paragraph f), with 20 (paragraph k); compare id. at 16 (paragraph c), with id. at 19 (paragraph h).

key fact—that the Factor 2 evaluation was based on an oral presentation. Consequently, analysis that only looks at Appddiction's slide presentation misses a fundamental component of the evaluation—not all of the information conveyed and evaluated during an oral presentation will be included in the presenter's slides. In fact, FEMA stated in the RFQ its "desire[] that oral presentation participants not read aloud or rely heavily on pre-written versions of the Quoter's oral presentation," AR 483, and those quoters who did risked "decreas[ing] the Government's level of confidence" in their quotes, id. at 490. Furthermore, the CO noted in his statement for the GAO that quoters were not required to submit slides for their oral presentations, and "the TET was advised by the [CO] and/or specialist not to refer to presentation slides and to only evaluate what the quoter presented orally." Id. at 2328.

Notwithstanding the underlying weakness of TERP's reliance on the contents of Appddiction's slides, the court will address each of the nine confidence bullet points from FEMA's technical evaluation that TERP criticizes. It will do so even though TERP's criticisms are recounted in the background section of its motion and are haphazardly organized. See supra note 13. Ultimately, as will be explained, none of TERP's contentions persuade the court that FEMA evaluated the quotes unequally.

First, TERP criticizes the confidence bullet FEMA listed in Appddiction's evaluation that references the "vendor's continuous recruiting approach and demonstration of 7-day turnaround on certain key roles." Pl.'s MJAR 13 (quoting AR 977). TERP argues that it should have been, but was not, given a similar confidence bullet. Id. at 14. The gravamen of TERP's argument is that it did not receive a confidence bullet using the same key words—such as "continuous recruiting"—as are found in Appddiction's confidence bullet. This myopic view is misplaced because it focuses on the specific language in Appddiction's confidence bullet rather than viewing the bullet more generally as a comment regarding staffing and hiring, which was one of the three main areas under Factor 2 (titled "Management, Staffing/Hiring, and Technical Approach"). AR 489. FEMA assumably used the phrase "continuous recruiting" because Appddiction's section on staffing was titled "Continuous Recruiting." See id. at 513. Analyzing TERP's and Appddiction's confidence bullets more holistically within the Factor 2 categories, TERP also received two confidence bullets for staffing: FEMA recognized TERP's ability to capture "incumbent staff" and its "robust" "approach to staff and managing the BPA Call Order." Id. at 980-81.

Second, TERP disagrees with the confidence bullet FEMA listed in Appddiction's evaluation stating that Appddiction's "communication plan would keep FEMA stakeholders informed throughout the work effort." Pl.'s MJAR 15 (quoting AR 977). TERP argues that the "only apparent basis" for this confidence bullet is the statement in Appddiction's slide presentation that Appddiction will "[c]ommunicate with FEMA Stakeholders on issue, cause, timeline to resolution, and provide regular updates." Id. (quoting AR 524). TERP focuses on one line on Appddiction's slide; however, the entire slide seems to discuss Appddiction's communication plan and work effort. AR 524. At the top of the slide, Appddiction presented a hypothetical scenario concerning issues related to a spike in helpline calls and system database transaction volume, and the remainder of the slide outlines how Appddiction would resolve the issues raised by that scenario by, in part, communicating and collaborating with FEMA. Id. TERP also argues that FEMA should have given TERP a similar confidence bullet for its communication plan, "which was clearly and specifically delineated" in its quote. Pl.'s

MJAR 15.  Appddiction responds that TERP's slide presentation included "only generic statements about engagements with stakeholders" and a "generic list of engagements, collaborations, and sessions that TERP would facilitate."  Def.-Int.'s Resp. & Cross-Mot. J. Admin. R. ("Def.-Int.'s Cross-MJAR") 11.  Even assuming that TERP's quote and presentation contained sufficient substance and detail to warrant a confidence bullet similar to Appddiction's, TERP already received the highest confidence rating for its Factor 2 evaluation.  Consequently, receiving the additional confidence bullet would not have raised TERP's confidence rating and therefore would not have altered the rough equivalence between the two quotes.

Third, TERP disputes the confidence bullet FEMA listed in Appddiction's evaluation stating that the "[c]ombination of external training, partnerships with Universities and other strategic stakeholders, continuous recruitment of top talent[,] and internal training and evaluation provides ready access to [a] strong bench of qualified staff to support needs."  Pl.'s MJAR 16 (quoting AR 978).  TERP first argues that "[t]he Appddiction slides contain no support for this bullet."  Id.  Setting aside the fact that the bullet may be referring to an oral statement rather than the contents of a slide, Appddiction's slides do provide support for this confidence bullet.  Appddiction's slide titled "Continuous Recruiting" mentions how Appddiction will require potential employees to "[c]omplete FEMA required training," as well as the process by which Appddiction can "constantly maintain[ .] prescreened bench for rapid response to RTPD Call Order Needs."  AR 513.  TERP observes that Appddiction's slides do not mention "universities" or "partnerships," and the only mention of "training" is on the slide that says newly hired employees must "[c]omplete FEMA required training."  Pl.'s MJAR 19.  However, looking at Appddiction's slide presentation as a whole, Appddiction did reference "various sourcing methods" and "Partner Recruiter Resources," both of which could be referencing universities and partnerships.  AR 513.  Finally, TERP argues that FEMA did not give TERP a similar confidence bullet.  Pl.'s MJAR 16.  However, that is not the case.  The confidence bullet at issue addresses Appddiction's staffing and hiring abilities.  FEMA gave TERP credit for its staffing abilities with a confidence bullet stating that TERP's "[s]trong teaming agreement and partnership provide[] a wide breadth of expertise and available support for the BPA."  AR 980.

Fourth, TERP challenges the confidence bullet FEMA listed in Appddiction's evaluation giving Appddiction credit for using [. . .].  Pl.'s MJAR 16-17 (quoting AR 978).  TERP first argues that "[t]he Appddiction slides do not reference [. . .].'"  Id. at 17.  Once again setting aside the oral nature of the presentation, Appddiction's slides do provide support for this confidence bullet.  Appddiction's slide titled "Converting Mobile Applications" mentions a [. . .] and the various ways that this design will capture user "approval/feedback."  AR 520.  TERP also argues that FEMA did not give TERP a similar confidence bullet.  Pl.'s MJAR 17.  However, this is once again not the case.  Appddiction's confidence bullet addresses Appddiction's technical approach to quality assurance.  Similarly, FEMA gave TERP credit for its "[d]etailed explanation of how Scaled agile framework would be applied to the BPA."  AR 981.  According to its slide presentation, TERP uses the "Scaled Agile Framework" to "ensur[e] quality in . . . delivery."  Id. at 823.

Fifth, TERP questions the confidence bullet FEMA listed in Appddiction's evaluation giving Appddiction credit for its "[d]etailed process by which [it] would integrate microservices, cloud technologies and mobile applications for this BPA while still supporting legacy systems."  Pl.'s MJAR 17 (quoting AR 978).  TERP first argues that "[t]he Appddiction presentation does

not mention the integration of 'microservices.'" Id.  Appddiction's slide presentation does not use the term "microservices"[14] but does address processes that one could reasonably construe as microservices, cloud technologies, and mobile applications.  For example, in its technical approach, Appddiction highlighted its plan to test, deploy, and maintain "Cloud Native Applications."  AR 518.  This approach seems to include characteristics of the microservice architectural style.  Further, in its slide concerning its approach to operations and maintenance, Appddiction depicted several stages of releases (i.e., deployments) using several teams for each release and focusing on those teams' "[b]usiness [c]apabilit[ies]."  Id. at 522.  Again, focusing on these areas could be construed as adopting a microservice architectural style.  TERP also argues that FEMA did not give TERP a similar confidence bullet.  Pl.'s MJAR 17.  However, in its slide presentation, TERP referred to microservices to discuss modernization, mobile applications, and staffing abilities, and FEMA gave TERP confidence bullets for these components of its quote.  See AR 766-67, 799, 814, 817, 825, 834, 980-81.

Sixth, TERP adversely critiques the confidence bullet FEMA listed in Appddiction's evaluation stating that Appddiction "understood that automated testing is not always feasible and that manual testing would be needed for some systems."  Pl.'s MJAR 18 (quoting AR 978).

---

[14]  The term "microservices" is not defined in the RFQ or the parties' quotes.  However, in general, the term, which is "also known as the microservice architecture," refers to

an architectural style that structures an application as a collection of services that are

- Highly maintainable and testable
- Loosely coupled
- Independently deployable
- Organized around business capabilities
- Owned by a small team

The microservices architecture enables the rapid, frequent and reliable delivery of large, complex applications.  It also enables an organization to evolve its technology stack.

22nd Century Techs., Inc. v. United States, No. 21-1137C, 2021 WL 3856038, at *8 n.5 (Fed. Cl. July 21, 2021) (citing Chris Richardson, Microservice Architecture, https://microservices.io (last visited July 27, 2022)).

In 22nd Century Technologies, Inc., the plaintiff argued—similarly to this case—that the procuring agency did not properly evaluate the offerors' technical proposals because the agency listed "micro services" as an element that "raised . . . the expectation of success rating" of the defendant-intervenor's proposal but did not list the same element for the plaintiff.  Id. at *8.  The court observed that the plaintiff mentioned "micro services" three times in its proposal as compared to defendant-intervenor's single reference.  Id.  It ultimately concluded that "'micro services' involves a subjective judgment that is for the Agency to make" and, therefore, it would "not second-guess the Agency's decision . . . especially in light of the fact that it relates to a technical rating."  Id. at *9 (citing E.W. Bliss Co., 77 F.3d at 449).

TERP first argues that "Appddiction's presentation does mention automated testing but it does not mention 'manual testing.'"  Id.  However, on one slide, Appddiction did include "testing the functionality" of "new features and capabilities" as a task to be performed by its development team.  AR 512.  This language does not exclude manual testing.  TERP also argues that FEMA should have given TERP a similar confidence bullet because its presentation mentioned both automated and manual testing.  Pl.'s MJAR 18 (citing AR 827).  This argument amounts to a disagreement with FEMA's evaluation decision to highlight a part of Appddiction's oral presentation regarding testing and "falls short of meeting the burden of proving the process was arbitrary and capricious."  See Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 49 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011).  Even if this court were to assume that TERP's quote and presentation contained sufficient substance and detail to warrant a confidence bullet similar to Appddiction's, TERP already received the highest confidence rating for its Factor 2 evaluation.  Consequently, receiving the additional confidence bullet would not have raised TERP's confidence rating and therefore would not have altered the rough equivalence between the two quotes.

Seventh, TERP disputes the confidence bullet FEMA listed in Appddiction's evaluation stating that Appddiction "[w]alked us through [its] approach to code commit in DevSecOps [development, security, and operations] [. . .]."  Pl.'s MJAR 18-19 (third alteration in original) (quoting AR 977).  TERP argues that Appddiction's single slide on cybersecurity does not mention DevSecOps, nor is there any description of deploying "smaller chunks" of code.  Id. at 19.  However, Appddiction's slide presentation references security on more slides than just the slide titled "Cybersecurity Compliance."  AR 523.  For example, on another slide, Appddiction grouped its staffing into six teams, and three of those teams have "security" or "cyber security engineer" in the team description.  Id. at 512.  Further, for two of the teams that concern security, the slide identifies, in "Roles/Skills," "programming and programming languages," which is sufficiently broad to include [. . .].  See id.  Additionally, Appddiction discussed security in its slides titled "Monolith Modernization" and "Data Management and Migration."  Id. at 517, 519.

Eighth, TERP disagrees with the confidence bullet FEMA listed in Appddiction's evaluation stating:  "The Appddiction One training platform to better understand technology and innovations for use as a sandbox without impact to live systems.  The Appddiction One sandbox presence will allow for both contractor and federal development staff to potentially work together to provide training, innovative technologies, and prototyping with new technologies."  Pl.'s MJAR 19 (quoting, without alteration, AR 978).  Appddiction's slide presentation does reference "collaborat[ing]" in the planning and design aspects of its technical approach, AR 518, but, as TERP observes, it does not reference an "Appddiction One training platform."  It appears that Appddiction mentioned its training platform during its oral presentation since FEMA is unlikely to have mentioned it otherwise.  Assuming for the sake of argument that Appddiction did not mention the platform during its oral presentation, the record does not reflect that the removal of the bullet from Appddiction's evaluation would have affected FEMA's award decision.  There is no suggestion that a change to a single bullet would have altered FEMA's analysis, and TERP does not argue that it should have received a similar confidence bullet such that it would have netted two confidence bullets in its favor.

Ninth, TERP takes exception with the confidence bullet FEMA listed in Appddiction's evaluation stating that Appddiction "[u]nderstood FEMA will evolve and that [Appddiction] will

adapt [its] approach, including the use of additional resources and job categories as capabilities change and to prepare for modernization." Pl.'s MJAR 20 (quoting AR 978). TERP argues that Appddiction's slide presentation has "no mention of using 'additional resources and job categories as capabilities change and to prepare for modernization.'" Id. However, this confidence bullet is supported by the record. In its slide presentation, Appddiction referenced its ability to "continuous[ly] evol[ve] components" in relation to its discussion on modernization and optimization. AR 517. Several slides later, Appddiction outlined its plan for a "Balanced Approach to [Operations and Maintenance], Modernization, and Urgent Needs." Id. at 522. In that plan, Appddiction would [. . .]. Id.

In summary, TERP has not demonstrated that FEMA's evaluation of quotes under Factor 2 was unequal. The bullet points in Appddiction's evaluation are supported by the record, and there is scant evidence that TERP was deprived of bullet points to which it was entitled. Consequently, FEMA's Factor 2 evaluation was not arbitrary or capricious, as it acted reasonably in assigning TERP and Appddiction equal, high confidence ratings. Furthermore, even construing the facts in TERP's favor, TERP has failed to demonstrate that it had a substantial chance of receiving the BPA but for FEMA's alleged errors in evaluating the quotes under Factor 2. Accordingly, it was not prejudiced by that evaluation.

As a final note, in its reply in support of its motion and response to defendant's and Appddiction's cross-motions, TERP challenges FEMA's documentation of the Factor 2 evaluation, arguing that the eleven confidence bullets it received and seventeen confidence bullets Appddiction received were insufficient under FAR subpart 8.4 to support FEMA's award decision. Pl.'s MJAR Reply & Resp. 3-7. The court addresses this documentation argument in its discussion of FEMA's best-value tradeoff decision, see infra Section II.B.3, but will briefly discuss it here as well. As compared to procurements under FAR part 15, procurements under FAR subpart 8.4 are subject to fewer documentation requirements. See Distributed Sols., Inc. v. United States, 106 Fed. Cl. 1, 24 (2012), aff'd, 500 F. App'x 955 (Fed. Cir. 2013). Specifically, under FAR subpart 8.4, the contracting officer is required to document the "[b]asis for the award decision," which "should include the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work." FAR 8.405-3(a)(7)(viii). Here, for the Factor 2 evaluation, FEMA listened to the quoters' oral presentations and, based on those presentations, composed bulleted lists of reasons that increased or decreased confidence in the quotes. This type of bulleted documentation satisfies the documentation requirement. See Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 375 (2007) ("It is sufficient that the TET heard [the quoter's] presentation and documented its contemporaneous impressions."). Pursuant to FAR subpart 8.4, FEMA was required to "provided a coherent and reasonable explanation" of the strengths and weaknesses of the individual quotes based on the RFQ's factors. See Matt Martin Real Est. Mgmt. LLC v. United States, 96 Fed Cl. 106, 117 n.12 (2010). As shown in the table above that lists the bullet points FEMA assigned TERP and Appddiction for Factor 2, FEMA's documentation complied both with the FAR and the RFQ's terms.

## 2. FEMA Adequately Considered Appddiction's Level of Effort and Labor Mix

TERP next argues that FEMA did not properly consider the quoters' proposed prices, specifically, the proposed labor hours and skill mix components. Pl.'s MJAR 26-29. TERP

claims that it was prejudiced because "Appddiction's quote was selected based on its lowest labor hour price without [considering whether] Appddiction could perform the NEMIS-IA Call Order with the labor mix and proposed level [of] effort, which were below the government estimate and below the level and different from that proposed by TERP." Id. at 29.  Put differently, TERP argues that if FEMA properly evaluated Appddiction's proposed labor hours and skill mix, FEMA would have concluded that Appddiction's proposed price was unrealistically low.  In response, Appddiction notes that "a price realism analysis was neither required nor permitted for this procurement."[15]  Def.-Int.'s Cross-MJAR 14.

Appddiction is correct.  As an initial matter, by effectively arguing that FEMA should have determined whether Appddiction's proposed price is unrealistically low, TERP is contending that a price realism analysis was required because, by definition, a "[p]rice realism analysis is done in fixed-price acquisitions to determine whether a price is unrealistically low and to what degree, and to figure out why it is low so that risk can be properly assessed."  Price Realism: A Primer, supra note 15; accord DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5, 663 n.11 (2010).  Furthermore, TERP fails to identify, and the court could not locate, any language in the RFQ expressly or impliedly requiring FEMA to conduct a price realism analysis.[16]  See UnitedHealth Mil. & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 554-55 (2017) (providing examples of language that has been deemed to require agencies to conduct a price realism analysis in the absence of an express directive in the solicitation).  Conducting a price realism analysis "[i]n situations where the solicitation does not expressly or implicitly require a price realism analysis" would be an improper use of unstated evaluation criteria.  Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 306 (2011).  To the extent

---

[15] The methods described in the FAR for ensuring that a proposed price is fair and reasonable include a "cost realism analysis," FAR 15.404-1(d), but not a "price realism analysis," see FAR 15.404-1.  However, "in common usage a cost realism analysis performed in a fixed-price acquisition is called a price realism analysis."  Price Realism:  A Primer, 28 Nash & Cibinic Rep. NL ¶ 1 (Jan. 2014).

[16] The language permitting FEMA to use "other price analysis techniques," AR 490, does not somehow open the door for FEMA to evaluate quoters' prices for price realism.  While this procurement falls under FAR subpart 8.4, FEMA references FAR part 15 when describing the evaluation criteria for Factor 3—price.  It does so explicitly, providing that "[d]ue to the potential variations in the technical approaches for the work that each Quoter may propose, technical analysis in accordance with FAR 15.404-1(e) may be conducted utilizing other quote information received from the Quoter in order to determine the need for and the reasonableness of the proposed resources and level of effort."  Id.  And, it does so by describing its method of evaluating proposed prices using the language of FAR 15.404-1(b).  Compare id. ("The 'total evaluated price' will be evaluated for price reasonableness through comparison with other proposed prices and [the evaluation] may include other price analysis techniques."), with FAR 15.404-1(b)(2) (instructing procuring agencies to use "various price analysis techniques and procedures to ensure a fair and reasonable price"), and FAR 15.404-1(b)(2)(i) (indicating that one price analysis technique is the "[c]omparison of proposed prices received in response to the solicitation").  The implicit adoption of FAR 15.404-1(b) forecloses the possibility that FEMA intended price realism to be included in "other price analysis techniques" because price realism is not among the price analysis techniques described in FAR 15.404-1(b).

that TERP believes such an analysis should have been required, it has waived that objection by not challenging the terms of the RFQ in a preaward bid protest.  See Blue & Gold Fleet, L.P., 492 F.3d at 1315 (providing that contractors who have the opportunity to object to the terms of a solicitation, but fail to do so, are precluded from later raising such objections in a bid protest).

Although FEMA did not conduct a price realism analysis, it did, in accordance with the FAR and the RFQ, consider proposed levels of effort and labor mixes when evaluating proposed prices.  Under FAR subpart 8.4, a contracting officer is "responsible for considering the level of effort and the mix of labor proposed to perform, and for determining that the proposed price is reasonable."  FAR 8.405-3(b)(2)(vi).  The contracting officer is also required to ensure that "all quotes received are fairly considered" and that the "award is made in accordance with the basis for selection in the RFQ."  Id.  In its analysis of overall price, FEMA looked at the quoters' proposed levels of effort and mixes of labor and properly concluded that TERP's and Appddiction's proposals were reasonable.

Specifically, in its Factor 2 evaluation, FEMA considered Appddiction's proposed level of effort and labor mix, giving Appddiction confidence bullets for "[o]ffer[ing] a shared services team, dev team, O&M team, and data team to split resources with key personnel to support multiple work streams" and for Appddiction's approach to task completion.  AR 978.  Similarly, FEMA considered TERP's proposed level of effort and labor mix, giving TERP confidence bullets for its "robust" "[a]pproach to staff and managing the BPA Call Order . . . to support multiple work streams."  Id. at 981.

FEMA also analyzed the quoters' proposed levels of effort and labor mixes in its Factor 3 evaluations.  Id. at 997-1004.  Appddiction and TERP received similar evaluations.[17]  For Appddiction, FEMA reported that "Appddiction's BPA Labor Rates submission included 33 GSA Schedule 31 Labor Categories with [. . .] unique BPA Functional Roles."  Id. at 1001.  FEMA noted that all of Appddiction's BPA labor rates "were confirmed to be equal or below the GSA Schedule labor rates" and that it did "not take issue with" Appddiction's proposed GSA Schedule rates average escalation of [. . .]%.  Id. at 1003.  FEMA similarly reported that "TERP's BPA Labor Rates submission included 38 GSA Schedule 70 Labor Categories" and noted that TERP's BPA labor rates were "equal or below the GSA Schedule labor rates."  Id. at

---

[17]  One difference between the two evaluations is that for TERP's evaluation, FEMA described a notable decrease in labor hours between option periods:

Of note, TERP's quoted hours for CLIN 0003 decrease significantly from the base period of 6 months to the first option period of 12 months . . . .  There is also [a] decrease in hours for CLIN 0001 after the base period per month . . . .  This decrease in hours is likely due [to] TERP's stated assumption that [it] anticipate[s] a reduction in staff count as automations are implemented.  However, the decrease in labor hours under CLIN 0003 is substantial and may not be fully explained by their automation assumption given the decrease in hours in labor hours [sic] is substantially different than the decrease in hours under CLIN 0001.

AR 999.

997-98.  FEMA also did not "take issue with" TERP's proposed GSA Schedule rates average escalation of [. . .]%.  Id. at 998.  Then, FEMA reviewed the base year labor categories/rates and the average escalation of the quoters' GSA Schedule rates and analyzed the quoters' CLIN pricing and labor hours to conduct a full-time-employee equivalence analysis of the quoters' pricing submissions.  The labor hours for Appddiction and TERP were as follows:

| TERP's NEMIS-IA Labor Hours | | | | | | |
|---|---|---|---|---|---|---|
| CLINs | Base Period | Option Period 1 | Option Period 2 | Option Period 3 | Option Period 4 | Total Hours |
| 0001 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| 0002 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| 0003 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| | | | | | | 193,680 |

| Appddiction's NEMIS-IA Labor Hours | | | | | | |
|---|---|---|---|---|---|---|
| CLINs | Base Period | Option Period 1 | Option Period 2 | Option Period 3 | Option Period 4 | Total Hours |
| 0001 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| 0002 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| 0003 | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| | | | | | | 197,220 |

Id. at 999, 1004.  Considering these evaluation results, FEMA concluded that both TERP and Appddiction "submitted quotes that demonstrated they are highly capable and qualified to meet the Government's needs."  Id. at 1007-08.  As a result, FEMA determined that the awards of the BPA and the first BPA call order to Appddiction would be "fair, reasonable, and represent a good business decision."  Id. at 1008.

Procuring agencies are provided "wide latitude" in conducting price reasonableness analyses.  DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting Agile Def., Inc. v. United States, 959 F.3d 1379, 1385 (Fed. Cir. 2020)).  FEMA complied with the FAR and the RFQ by considering the overall proposed level of effort and labor mix for each CLIN to determine whether the quoter's approach was "adequate to successfully perform the tasks/subtasks outlined" in the BPA and NEMIS-IA work statements.  AR 489.  Further, FEMA opined on the quoters' proposed labor hours, and it directly compared Appddiction's and TERP's proposals.  See Serco Inc. v. United States, 81 Fed. Cl. 463, 494 (2008) ("[A]n agency may conclude that an awardee's price is reasonable if it is consistent with the prices received from various competitors . . . ." (emphasis in original)); FAR 15.404-1(b)(2) (indicating that a "[c]omparison of proposed prices" can be used "to ensure a fair and reasonable price").  Therefore, FEMA's price evaluation relating to levels of effort and labor mixes was not improper.

### 3.  The Best-Value Tradeoff Decision Was Not Arbitrary or Capricious

TERP's final argument is that FEMA failed to properly conduct and document its best-value tradeoff decision.  Pl.'s MJAR 29.  Instead, TERP alleges, after finding both Appddiction's and TERP's quotes to be technically equal, FEMA made its decision based on the lowest

evaluated price, as reflected by its failure to provide adequate documentation of the evaluation methodology and rationale for any tradeoffs.[18] Id. This court disagrees. FEMA's evaluation complied with the terms of the RFQ and requirements of the FAR, and its best-value tradeoff decision was not arbitrary or capricious.

Pursuant to FAR subpart 8.4, procuring agencies are to select the quoter "that represents the best value." FAR 8.405-3(b)(2)(viii). The FAR sets out certain documentation requirements, including the requirement that the procuring agency document "[t]he rationale for any tradeoffs in making the selection . . . ." FAR 8.405-3(a)(7)(viii). TERP argues that FEMA's documentation is deficient because "[t]here is no crosswalk analysis between the two quotes, no extensive analysis, no trade-off of technical merits, [and] no exploration of the benefits of Appddiction's quote versus TERP's quote." Pl.'s MJAR Reply & Resp. 7. However, "this procurement is a FAR Subpart 8.4, not FAR Part 15, procurement for which the Agency is neither expected nor required to document every decision it makes in rigorous detail." 22nd Century Techs., Inc., 2021 WL 3856038, at *10 (citing Matt Martin Real Est. Mgmt. LLC, 96 Fed. Cl. at 116-17). FEMA's documentation satisfies the FAR's requirements.

Turning to the tradeoff decision itself, FEMA explained in the RFQ that it was "more concerned with obtaining a technically superior evaluation than with obtaining the lowest priced solution." AR 488. However, it also stated that if the quotes' technical factor ratings or merits were close or even to each other, "price [would] become more important in the award decision." Id.

The CO applied this evaluation model in the source selection decision, describing his "rationale for business judgments and tradeoffs." Id. at 1007. He explained why other quoters fell short of Appddiction and TERP in their technical evaluations, which "left [Appddiction and TERP] as the two remaining Quoters to consider for award." Id. Specifically, the CO stated:

> I reviewed the non-price factor ratings, the consensus evaluation findings, and the pricing of each quote received from both companies. TERP and Appdiction [sic] both received two High Confidence ratings from the TET for the non-price factors in Phase[s] I and II. Both companies submitted quotes that demonstrated they are highly capable and qualified to meet the Government's needs. The Government has a high level of confidence that both companies understand the Government's requirements and would be successful in performing under the resultant BPA and call order awards.
>
> Per the solicitation, the total evaluated price to be considered for award under this BPA procurement shall be derived from the Quoter's proposed pricing for the base plus all option periods for the first BPA call order (NEMIS-IA Call Order). TERP proposed a total evaluated price of $27,131,005.32. Appdiction

---

[18] TERP also briefly reiterates its argument that FEMA "failed to consider 'the mix of labor categories and level of effort required to perform the services described.'" Pl.'s MJAR 30. The court addressed this argument in the previous section.

[sic] proposed a total evaluated price of $22,941,805.65.  Appddiction's [sic] total evaluated price is $4,189,199.67 or 15% lower than TERP's total evaluated price.

Id. at 1007-08.  Then, in his summary, the CO explained that he considered TERP and Appddiction "technically equal for the non-price factors" and observed that Appddiction's total evaluated price was more than $4 million below TERP's.  Id. at 1008.  As a result, he concluded that Appddiction's quote "offer[ed] the best overall value to the Government."  Id.

As explained by the CO, TERP and Appddiction received the same "high confidence" adjectival ratings for the technical, nonprice factors.  TERP argues that "[i]dentical adjectival ratings do not necessarily mean that proposals are identical" and, therefore, the court should look beyond the adjectival ratings in its review of the CO's tradeoff analysis.  Pl.'s MJAR Reply & Resp. 6 n.3 (citing Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009)).  However, even looking beyond those adjectival ratings, the record supports the CO's determination that TERP and Appddiction are "technically equal."

For Factor 1, FEMA evaluated the quoters' demonstrated prior experience and documented reasons that increased and decreased confidence in the quoters.  TERP received seventeen confidence bullets for aspects of its quote that increased FEMA's confidence in TERP.  AR 968-69.  Appddiction received fifteen confidence bullets and one lack-of-confidence bullet.  Id. at 964-65.  TERP makes no allegations in its complaint or briefs that the Factor 1 evaluations were in any way flawed or deficient.  In looking beyond the uniform adjectival ratings, the CO's determination that the two quotes were technically equal is reasonable.  Both TERP and Appddiction received confidence bullets for similar areas of prior experience, such as prior experience in the areas of staffing, technical knowledge, ability, compliance, and collaboration.  In fact, FEMA used similar language in both evaluations, referencing the modernization of monolithic systems, use of scaled agile frameworks, and creation of mobile applications.

For Factor 2, FEMA evaluated quotes in the categories of management, staffing/hiring, and technical approach, and stated that it would "assess its level of confidence that [each] Quoter can successfully manage and staff the BPA and NEMIS-IA call order, perform the required tasks, and provide the [required] deliverables . . . ."  Id. at 489.  As discussed above, TERP received eleven confidence bullets and one lack-of-confidence bullet.  Id. at 980-81.  Appddiction received seventeen confidence bullets.  Id. at 977-78.  TERP again argues that it should have received confidence bullets that Appddiction received because TERP's slide presentation contained similar language to the language of Appddiction's confidence bullets.  For example, TERP states the following:

> Appddiction's slide deck stated:  "7 Days to Onboard" and "Continuous Recruiting – constantly maintains prescreened bench for rapid response to RTPD Call Order Needs" for which it received an increases confidence bullet that stated: "[t]he vendor's continuous recruiting approach and demonstration of 7-day turnaround on certain key roles".  In turn, TERP's slide deck and presentation provided a detailed approach that answered the question asked.

Pl.'s MJAR Reply & Resp. 8 (quoting AR 513 and citing id. at 829, 831).  As previously explained, this one-for-one matching exercise is misguided.  TERP and Appddiction used

different language and focused on different subjects during their oral presentations, producing differently worded Factor 2 evaluations, but these differences do not mean that their "high confidence" ratings are distinguishable.

The court "will not disturb an agency's best value decision merely because a disappointed bidder disagrees with the agency's analysis." Blackwater Lodge & Training Ctr., Inc., 86 Fed. Cl. at 515 (citing E.W. Bliss Co., 77 F.3d at 449). Instead, "[a] court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner." Med. Dev. Int'l, Inc. v. United States, 89 Fed. Cl. 691, 702 (2009) (citing Advanced Data Concepts, Inc., 216 F.3d at 1058). Here, FEMA's best-value tradeoff analysis was consistent with the RFQ and the FAR, and was a "coherent and reasonable explanation of its exercise of discretion." MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 519 (2011). Accordingly, the court finds nothing arbitrary or capricious in FEMA's best-value tradeoff determination.

### 4. TERP Is Not Entitled to Injunctive Relief

TERP has not established that FEMA unequally evaluated the quotes, failed to appropriately consider Appddiction's level or effort and labor mix, or improperly conducted the best-value tradeoff. In other words, it has not succeeded on the merits of its claims. Therefore, the court need not address the remaining elements of TERP's request for injunctive relief: irreparable injury, balance of harms, and the public interest. Accord Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir. 2018) (stating that "proving success on the merits is a necessary element for a permanent injunction").

## III. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

For the reasons set forth above, the court **DENIES** TERP's motion to supplement the administrative record and **DENIES** as moot defendant's motion to strike statements included in TERP's reply in support of its motion for judgment on the administrative record and response to the cross-motions for judgment on the administrative record because the court did not rely of those statements in its decision. Further, the court **DENIES** TERP's motion for judgment on the administrative record and **GRANTS** defendant's and Appddiction's cross-motions for judgment on the administrative record. The clerk is directed to enter judgment accordingly and dismiss the case. No costs.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, **by no later than Wednesday, August 10, 2022,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties that they are obligated, pursuant to paragraph 12 of the protective order filed on February 15, 2022, to file redacted versions of protected documents for the public record and, pursuant to the order filed on June 2, 2022, to submit those redacted versions within 30 days of the protected document's filing date.[19]  If the parties have not already filed redacted versions of their protected documents, they shall file a joint status report **by no later than Wednesday, August 10, 2022**, explaining the reason for delay.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Senior Judge

---

[19]  Based on the current docket, documents 34, 47, and 50 do not have corresponding redacted versions.